**Olympia MAGGIPINTO and her husband, Cosmo Maggipinto, Plaintiffs-Appellants,**

**v.**

**Leonard REICHMAN, D.D.S., Defendant-Appellee.**

No. 78–2403.

United States Court of Appeals, Third Circuit.

Argued June 8, 1979.

Decided Oct. 17, 1979.

Avram G. Adler, Stanley P. Kops, Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., for plaintiffs-appellants.

Daniel N. German, J. Grant McCabe, III, Rawle & Henderson, Philadelphia, Pa., for defendant-appellee.

Before ADAMS and ROSENN, Circuit Judges, and LACEY, District Judge.*

**OPINION OF THE COURT**

LACEY, District Judge.

In this diversity suit, Olympia Maggipinto charges the defendant, an oral surgeon, with dental malpractice and with performing oral surgery upon her without obtaining her informed consent. Her malpractice claim, grounded upon injury to her right lingual nerve, was dismissed on defendant's motion for a directed verdict, Fed.R.Civ.P.

* Sitting by designation.

50(a). The informed consent claim resulted in a jury verdict in defendant's favor.[1]

On this appeal Mrs. Maggipinto contends that the district court erred in granting the motion for a directed verdict and in its instructions to the jury on the law of informed consent. We find no error in the trial judge's instructions on the informed consent claim; however, we remand the matter to the trial court for an explication of its reasons for granting the defendant's motion for directed verdict.

On March 21, 1975, the defendant extracted Mrs. Maggipinto's left and right lower second molars and removed by excision her impacted lower right third molar. Shortly after this surgery, she complained of numbness of the right side of the tongue. It is undisputed that this condition is associated with impairment of the lingual nerve.

Mrs. Maggipinto's contention was that the defendant, in excising her lower right third molar, had pierced the lingual plate and severed the lingual nerve.[2] The defendant admitted that his surgery had caused injury to the nerve. He denied, however, what was central to plaintiff's case, that Mrs. Maggipinto's lingual plate had been pierced and her lingual nerve severed.

At trial the plaintiffs called the defendant as an adverse witness, Fed.R.Evid. 611(c), and, under direct examination, in describing the operative procedure, defendant testified that he removed a portion of Mrs. Maggipinto's buccal plate and "dislodge[d] the . . . [lower right third molar] from its socket" and removed it. 26a. He stated that the procedure was "uneventful." 27a. He denied that he had perforated the lingual plate, 64a, 80a, and the record is without evidence that he did.

Defendant was next confronted with two medical texts, *Oral Surgery* (3d ed.), edited by Kurt H. Thoma (Thoma); and *Oral and Maxillofacial Surgery* (5th ed.), edited by Archer (Archer). He acknowledged both to be authoritative. 11a.[3] Plaintiffs' counsel, who contends here that he was proceeding under Fed.R.Evid. 803(18),[4] then proceeded in the fashion traditionally used to impeach an expert witness, referring the defendant to Thoma and asking (27a):

> Do you agree with this statement: "Injury to the lingual nerve is not usually caused by the removal of a third molar, although it may occur if a tooth that erupts at the lingual surface of the jaw below the mylohyoid ridge must be removed. *In ordinary cases injury of the lingual nerve would occur only by gross negligence, the slipping of a hand chisel or a lever used with uncontrolled application of excessive force.*" (emphasis added)

---

1. Cosmo Maggipinto asserted a claim for lost services. His claims of course fell with his wife's.

2. The jaw includes two bony plates: the buccal plate, next to the cheek, and the lingual plate, proximate to the tongue. 21a. The lingual nerve is medial to the lingual plate, 22a, that is, outside the lingual plate, toward the tongue. 23a.

3. The defendant later said there had been revisions in Thoma's book. 89a. While not a part of the record below, we are now told that in subsequent editions of this book the sentence underlined in the quoted portion of Thoma had been eliminated. Appellee's Brief, 8–9. Plaintiffs do not dispute this. *Cf.* Fed.R.Evid. 201(b). The defendant has not formally asked us to take judicial notice of the revision. While we could clearly do so, *see* Rule 201(f), we do not find it appropriate to do so at this juncture.

4. Rule 803(18) embodies the "learned treatises" exception to the "hearsay" rule and provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> \*   \*   \*   \*   \*   \*
>
> To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

Materials admitted under this subsection are, of course, accorded substantive value, and are not merely impeachment evidence.

Defendant's counsel, apparently under the impression that plaintiff's counsel was simply trying to impeach the defendant, made only a limited objection to the question, namely, that no foundation had been laid for such impeachment. 27a. The district judge overruled the objection. 28a. No reference was made by anyone to Rule 803(18); the record at that point is barren of even a suggestion that the quoted portion of the text was intended to be, or would be, given substantive value.[5] The defendant then answered (28a): "I disagree with that statement wholeheartedly. I know it is written in Thoma's text and it is totally erroneous."

Thereafter plaintiffs' counsel referred the defendant to Archer's text (62a):

Doctor, I show you a book which you have considered authoritative, "Archer on Oral and Maxillofacial Surgery," and it says, "Complications," and I refer you to "Complications during or after removal of impacted malopposed or rudimentary teeth," and can you tell me in the nineteen things that it mentions, does it mention a permanent injury to the lingual nerve?

The defendant responded (63a–64a):

It does not. However, No. 18 . . . "forcing an apex through the lingual plate of the mandibular sub-lingual space," which is pertinent. They mention something else which is not pertinent.

It appears to me that if this were to happen, you would have an injury to the lingual nerve, but it doesn't mention it specifically.

At another point, a question from plaintiffs' counsel suggested that injury to the lingual nerve can only occur if, as plaintiffs claim happened here, the lingual plate is penetrated. 78a. The defendant rejected the suggestion, 79a, and then gave his opinion as to how the injury occurred (79a):

[I]f I can show you the X-rays, there has been marked bone resorption of both the buccal and lingual plates in there. By that I mean the tooth is embedded in bone and this bone is down and this nerve is up in here, the soft tissue. . . . So we are not penetrating the lingual plate. The nerve might be laying right there and there is no way of knowing because we don't identify it. We don't see it. It's blind.

Plaintiffs rested without adducing any expert testimony on (a) the accepted standard of treatment; (b) whether the defendant's conduct constituted a deviation from that standard; and (c) proximate cause.[6] Even more significantly, given plaintiffs' theory of the case, no expert testimony was offered to support the plaintiffs' contention that the defendant had penetrated Mrs. Maggipinto's lingual plate and that this had resulted in severing her lingual nerve. Indeed, there was no testimony that the lingual nerve had been severed. Instead, plaintiffs, in arguing against defendant's motion for a directed verdict, relied upon the Thoma and Archer materials read to the defendant as having substantive value, to establish their prima facie case. The district judge, without directly responding to this contention, granted the motion for a directed verdict, stating (152a):

---

5. The uncertain state of the record may result in part from the provision in Rule 803(18) that "[i]f admitted, the statements may be read into evidence but may not be received as exhibits." The district judge may have been under the impression that while being used for impeachment the "statements" were not being "read into evidence" under Rule 803(18), since plaintiffs' counsel made no formal offer of the "statements" under Rule 803(18), a requisite were the treatises themselves to have been "received" in evidence. We leave unanswered, since not raised by the defendant on this appeal, whether Rule 803(18) requires such a formal offer.

6. Under Pennsylvania law the doctrine of *res ipsa loquitur* has been abolished in medical malpractice cases and no inference of negligence can be made merely because of an unfortunate result in medical procedures. This is true in dental malpractice cases as well. *Lambert v. Soltis*, 422 Pa. 304, 221 A.2d 173 (1966); *Bierstein v. Whitman*, 360 Pa. 537, 62 A.2d 843 (1949). Thus, expert testimony in support of a plaintiff's claim is an indispensable requirement to establish a right of action. *Chandler v. Cook*, 438 Pa. 447, 451, 265 A.2d 794, 796 (1970); *Collins v. Hand*, 431 Pa. 378, 383, 246 A.2d 398, 401 (1968).

There has to be somebody rendering an opinion that, "Upon all this evidence, in my opinion, the lingual plate was pierced that resulted in a severing of the nerve and that caused the lady's condition." You just can't have the jury guess as to whether that would happen.

In so deciding, the district judge leaves us uncertain as to whether he admitted the Thoma and Archer materials for impeachment purposes only, see 623, note 5 supra, or admitted them as substantive evidence under Rule 803(18) but found them insufficient to establish a prima facie case.[7] Upon remand, he will have the opportunity to set forth his analysis as it related to his disposition of the issue raised by plaintiffs' contention that the defendant's motion for directed verdict was improperly granted.

The plaintiffs argue that the district court, in submitting the informed consent claim to the jury, improperly instructed the jury on applicable Pennsylvania law. Citing only to one portion of the court's charge, 321a, plaintiffs complain that the district judge conveyed to the jury the notion that the test of what a patient is to be told by a physician, for consent to be informed, is to be found in what physicians themselves believe is appropriate. We have carefully reviewed the entire charge and find that the jury was clearly instructed that the question of what should have been revealed to Mrs. Maggipinto was to be determined by whether the defendant disclosed all those facts, risks and alternatives a reasonable person, in Mrs. Maggipinto's position as the defendant knew it, would deem significant in making a decision to undergo the recommended treatment. *Cooper v. Roberts*, 220 Pa.Super. 260, 286 A.2d 647, 650–51 (1971). Since the jury was properly instructed, the judgment entered upon the jury verdict will be affirmed.

The cause will be remanded to the district court for consideration and action in accordance with this opinion, with respect to the district court's order granting the motion for directed verdict.

Each side is to bear its own costs.

---

7. In reviewing a grant of a motion for a directed verdict, the standard to be used is the same standard as applied by the district court initially. *Dulin v. Circle F Indus., Inc.*, 558 F.2d 456, 465 (8th Cir. 1977); *O'Neill v. Kiledjian*, 551 F.2d 511, 513 (6th Cir. 1975); 9 Wright & Miller, Federal Practice and Procedure, § 2524 (1971). The rule in this circuit is that "[a] directed verdict should not be granted for a defendant 'if there is evidence reasonably tending to support the recovery by plaintiff as to any of its theories of liability.'" *Hunziker v. Scheidemantle*, 543 F.2d 489, 494 n.8 (3d Cir. 1976), quoting *Dougherty v. Hooker Chem. Corp.*, 540 F.2d 174, 178 (3d Cir. 1976).