**F.W. HEMPEL & CO., INC., a corporation, Plaintiff-Appellant,**

v.

**METAL WORLD, INC., a corporation, and Ledoux and Company, a corporation, Defendants-Appellees.**

No. 82–2637.

United States Court of Appeals, Seventh Circuit.

Argued April 8, 1983.

Decided Nov. 21, 1983.

---

Robert E. DeRight, Jr., Alexander & Green, New York City, for plaintiff-appellant.

Stanley W. Kallmann, Gennet & Kallman, Roseland, N.J., for defendants-appellees.

Before PELL and COFFEY, Circuit Judges, and WEIGEL, District Judge.*

WEIGEL, District Judge.

F.W. Hempel & Co., Inc. ("Hempel") appeals from a judgment notwithstanding the verdict. This judgment in favor of appellee Ledoux and Company ("Ledoux") was rendered after a jury verdict in the United States District Court for the Southern District of Illinois by United States Magistrate Kenneth J. Meyers, sitting as the trial court, pursuant to 28 U.S.C. § 636(c)(1). Our jurisdiction rests on 28 U.S.C. § 1291.

 Hempel is engaged in buying, selling, and trading metal commodities. Ledoux is a corporation in the business of sampling, analyzing, and reporting on its analysis of metal commodities on behalf of producers and users.[1]

On October 5, 1979, Hempel contracted in writing to purchase a quantity of "Technical Grade Molybdic Oxide" ("TGMO") from Metal World, Inc. ("Metal World"), a buyer and seller of scrap metal. This agreement conditioned payment by Hempel upon, *inter*

---

* The Honorable Stanley A. Weigel, Senior District Judge for the United States District Court for the Northern District of California, is sitting by designation.

1. In granting Ledoux's motion for judgment notwithstanding the verdict, the district court stated that "there was no evidence at trial that Ledoux exclusively performs its sampling and analysis for the benefit of potential buyers. On the contrary, the uncontroverted evidence was that Ledoux commonly samples and analyzes for product users and producers who will modify the product after Ledoux has analyzed it." *F.W. Hempel & Co. v. Metal World, Inc., et al.,* No. CV 80–3091 (S.D.Ill. Sept. 10, 1982) (memorandum and order granting judgment notwithstanding the verdict). Since neither party has challenged this finding, it will stand. There is no reason to deem it "clearly erroneous." Fed. R.Civ.P. 52(a).

*alia,* receipt of a "Ledoux Assay Certificate". At some point between October 5 and October 15, 1979, Ledoux entered into an oral contract with Metal World.[2] Under this contract, Ledoux agreed to sample, analyze, and report on certain materials at Metal World's East St. Louis, Missouri, plant.

On October 15, 1979, James L. Buck, a Ledoux employee, arrived at Metal World's East St. Louis facility and took representative samples from 83 drums of TGMO. After completing sampling of each drum on October 15, Buck sealed each drum twice. He then sent portions of these samples to Ledoux's laboratory for analysis. A Ledoux "Weight Certificate" relating to the 83 drums examined by Buck, dated October 15, 1979, states that the material was weighed by Buck "for F.W. Hemple [sic]."

On October 26, 1979, Ledoux issued its Report of Analysis, or "Ledoux Assay Certificate" ("October 26 Report"), stating that the sampled TGMO contained 58.73% molybdenum.[3] On November 8, 1979, a Hempel representative telephoned Ledoux and requested information as to the percentage of phosphorous contained in the 83 drums sampled by Buck. This information had not been included in the October 26 Report. On November 9, 1979, Ledoux released, via telex, to Hempel its analysis of the phosphorous content.

On November 12, 1979, in reliance on the data released by Ledoux, Hempel took delivery of the 83 drums and paid Metal World $198,623.46. Hempel then directed that the drums be passed on to a trucker. On November 16, 1979, the trucker, at Hempel's instruction, delivered the drums to Powell Metals & Chemicals ("Powell") in Rockford, Illinois. Upon the arrival of the drums there, Powell rejected the shipment of all 83 drums because the material in them allegedly was not TGMO, and because several drums were damaged and/or had broken or removed seals. Hempel agreed to replace this defective shipment. Hempel then tendered the rejected material back to Metal World, but Metal World refused to take it back.

In December, 1979, Hempel retained Andrew S. McCreath & Son, Inc. ("McCreath") to take and analyze a representative sample from the 83 drums rejected by Powell. After carrying out its sampling, McCreath issued three reports. None revealed the sample to have more than 44.79% content of molybdenum, substantially below the molybdenum level reported by Ledoux.

On August 7, 1980, Hempel commenced this diversity action against Metal World and Ledoux in the United States District Court for the Southern District of Illinois.[4] A jury trial before Magistrate Meyers, sitting as the district court, began on April 26, 1982. On April 29, 1982, the jury returned a $147,834.52 verdict for Hempel against Ledoux on Hempel's claim that it was a third party beneficiary of the supposedly breached agreement between Metal World and Ledoux.[5] Judgment was entered accordingly, on May 3, 1982.

Ledoux subsequently moved for judgment notwithstanding the verdict or, alternatively, for a new trial, pursuant to Fed.R. Civ.P. 50(b). On September 7, 1982, the district court granted the motion for judgment notwithstanding the verdict, conclud-

---

**2.** The record does not show the exact date of the oral contract.

**3.** Any reason for the bare mention of "F.W. Hempel & Co., New York" on the Report is not explained in the context of the Report nor by any other evidence in the record.

**4.** On January 27, 1982, Metal World's counsel moved to withdraw from this case due to the company's instruction that counsel do nothing further to defend this action. The district court granted this motion on February 19, 1982, and gave Metal World until March 2 to have a new attorney enter an appearance or else face default. When no appearance was entered by the appointed date, the district court, on March 17, 1982, entered default against Metal World. Metal World *appears to have ceased doing business.*

**5.** In addition to its cause founded on its purported status as a direct third party beneficiary, Hempel initially also brought a claim against Ledoux for alleged negligent misrepresentation. At trial, Hempel dismissed this claim with prejudice.

ing that there was insufficient evidence from which the jury could have found that Hempel was a third party beneficiary of the agreement between Metal World and Ledoux. The district court also conditionally granted Ledoux's alternative motion for a new trial, in the event of an appellate reversal or vacation of the judgment notwithstanding the verdict, pursuant to Fed.R. Civ.P. 50(c)(1).

■ In a diversity action, it is settled that state law governs disposition of a motion for judgment notwithstanding the verdict. *See Kuziw v. Lake Engineering Co.,* 586 F.2d 33, 35 (7th Cir.1978); *Kudelka v. American Hoist & Derrick Co.,* 541 F.2d 651, 654 (7th Cir.1976). The parties agree that Illinois law controls on this appeal from the district court's judgment.

■ In *Pedrick v. Peoria & Eastern Railroad Co.,* 37 Ill.2d 494, 229 N.E.2d 504, 513–14 (1967), the Supreme Court of Illinois stated that a trial court should enter judgment notwithstanding the verdict "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." When reviewing a district court's decision on a motion for judgment notwithstanding the verdict, this Court applies the same standards as the court below did. *Pinkowski v. Sherman Hotel,* 313 F.2d 190, 192 (7th Cir.1963). *See also Rosenberg v. Trautwein,* 624 F.2d 666, 669 (5th Cir.1980); *Maggipinto v. Reichman,* 607 F.2d 621, 624 n. 7 (3d Cir. 1979). *Pedrick* governs our view of the district court's decision. We are mindful, therefore, that judgment notwithstanding the verdict should rarely be entered. *See Clemons v. Mitsui O.S.K. Lines, Ltd.,* 596 F.2d 746, 748 (7th Cir.1979), *cert. denied sub nom. McCulley v. Mitsui O.S.K. Lines, Ltd.,* 451 U.S. 969, 101 S.Ct. 2044, 68 L.Ed.2d 347 (1981).

■ There is no question that the seminal and still vital Illinois authority as to third party beneficiaries is *Carson Pirie Scott & Co. v. Parrett,* 346 Ill. 252, 178 N.E. 498 (1931). *See Altevogt v. Brinkoetter,* 85 Ill.2d 44, 51 Ill.Dec. 674, 421 N.E.2d 182 (1981); *Illinois Housing Development Authority v. Sjostrom & Sons, Inc.,* 105 Ill. App.3d 247, 61 Ill.Dec. 22, 433 N.E.2d 1350 (1982). In *Carson Pirie Scott,* the Supreme Court of Illinois stated, 178 N.E. at 501:

> "The rule is settled in this state that, if a contract be entered into for a direct benefit of a third person not a party thereto, such third party may sue for breach thereof. The test is whether the benefit to the third person is direct to him arising from the contract. If direct, he may sue on the contract, if incidental he has no right of recovery thereon."

The *Carson Pirie Scott* court went on to assert:

> "The rule is that the right of a third party benefited by a contract to sue thereon rests upon the liability of the promisor, and this liability must affirmatively appear from the language of the instrument when properly interpreted and construed. The liability so appearing cannot be extended or enlarged on the ground alone that the situation and circumstances of the parties justify or demand further or other liability." *Id.*

Thus, *Carson Pirie Scott* has established that a third party is a direct rather than an incidental beneficiary "only if the contracting parties have manifested in their contract an intention to confer a benefit upon the third party." *Altevogt v. Brinkoetter,* 421 N.E.2d at 187. *See also Waterford Condominium Association v. Dunbar Corp.,* 104 Ill.App.3d 371, 60 Ill.Dec. 110, 432 N.E.2d 1009 (1982). The express language of the contract and the surrounding circumstances at the time the contract was executed determine whether or not the contracting parties intended to benefit a third party directly. *Carson Pirie Scott,* 178 N.E. at 501. *See also People ex rel. Resnick v. Curtis & Davis Architects & Planners, Inc.,* 78 Ill.2d 381, 36 Ill.Dec. 338, 400 N.E.2d 918 (1980); *Illinois Housing Development Authority,* 433 N.E.2d at 1350. However, the contract need not name a particular third party beneficiary. "The contract may

define a third party by description of a class, and it is sufficient if the plaintiff may be identified at the time performance is due as a member of the class intended to be benefited." *Altevogt v. Brinkoetter*, 421 N.E.2d at 187. Under Illinois law, there is always a strong presumption that contracting parties bargain and agree for themselves and only incidentally for third persons. *See Waterford Condominium Association*, 432 N.E.2d at 1011; *Midwest Concrete Products Co. v. LaSalle National Bank*, 94 Ill.App.3d 394, 49 Ill.Dec. 968, 418 N.E.2d 988, 990 (1981).

■ Thus, it is the Court's task to scrutinize the intention of the parties at the time they entered into the contract to determine whether or not a particular entity, either individually or as a member of a certain class, is a direct third party beneficiary. *See Waterford Condominium Association*, 432 N.E.2d at 1011; *Midwest Concrete Products Co.*, 418 N.E.2d at 990. Our review of the record in this case has disclosed no proof that at the time Metal World and Ledoux entered into their oral agreement (sometime between October 5 and October 15, 1979), both parties intended the contract to be for the direct benefit of Hempel.[6] *See Carson Pirie Scott*, 178 N.E. at 501. Richard Becker, one of Hempel's witnesses and President of Metal World, testified that originally Ledoux was "hired without Hempel. They had nothing to do with Hempel." Moreover, James Buck, another of Hempel's witnesses, testified that, on October 15, 1979, when he took representative samples from the 83 drums of TGMO, he possessed "no information whatsoever as to Metal World's intentions for the product" and that he "heard no company mentioned during his sampling." We have discovered nothing contradicting this testimony. Indeed, Hempel has provided evidence merely as to Metal World's and Ledoux's intentions subsequent to the completion of their oral agreement.[7]

Likewise, we have found the record barren of proof that Metal World and Ledoux, at the time they entered into their oral agreement, intended to benefit a class of which Hempel was a member. *See Altevogt v. Brinkoetter*, 421 N.E.2d at 107. Evidence adduced at trial demonstrated that Ledoux typically samples, analyzes, and reports on material for producers and users of that material. Hempel was a buyer for resale or trade, not a producer or user. There is nothing in the record to suggest that Ledoux served such buyers as a class nor that the particular contract it entered into with Metal World was for the benefit of Hempel.

■ Hempel concedes that its purported status as a direct third party beneficiary must be tested with reference to the intentions of Metal World and Ledoux at the time the two parties "executed" their agreement. *See Carson Pirie Scott*, 178 N.E. at 501. However, Hempel argues that this point of execution differs in cases involving written and oral agreements. While Hempel maintains that a written agreement is executed at formation, Hempel contends that an oral agreement is executed, and the parties' intentions are to be adjudged, during the course of performance. Hempel's position is groundless. It ignores recent Illinois law that contracting parties' intentions are to be gleaned at

---

6. Contrary to Hempel's submissions, the fact (standing alone as it does) that Hempel's October 5, 1979, purchase agreement with Metal World conditioned payment upon Hempel's receiving a "Ledoux Assay Certificate" has no relevance on the question of Metal World's and Ledoux's intentions at the time they entered into their oral agreement. The written purchase agreement was between different parties and for different purposes.

7. Hempel points to the following in support of its alleged position as a direct third party beneficiary: (1) the October 15, 1979, "Weight Certificate" including a reference to Hempel; (2) the October 26 Report mentioning Hempel; (3) the November 9, 1979, telex from Ledoux to Hempel describing the phosphorous content of the sampled material; (4) Buck's sealing of the drums after sampling their contents, on October 15, 1979; and (5) the testimony of Kenneth Vonderporten, a Ledoux official, that such sealing is carried out only when the material sealed is to be sold. All this purported evidence relates to the period after Metal World and Ledoux entered into their oral agreement.

formation. *See Waterford Condominium Association,* 432 N.E.2d at 1011; *Midwest Concrete Products Co.,* 418 N.E.2d at 990. Moreover, Hempel's position is founded on inapposite authority.[8] In short, Hempel asks the Court to acknowledge the validity of one rule for divining the parties' intentions in cases involving written contracts, while creating a divergent standard for cases concerning oral agreements. In the absence of Illinois precedent for such different treatment, we decline to do so.

Since there was no evidence supporting the jury's verdict that Hempel was a direct third party beneficiary of the oral agreement between Metal World and Ledoux, the district court acted correctly under Illinois law in granting Ledoux's motion for judgment notwithstanding the verdict. *See Pedrick v. Peoria & Eastern Railroad Co.,* 229 N.E.2d at 513–14. Accordingly, the judgment of the district court is affirmed.[9]

[redacted]

8. Neither *Bd. of Educ. of Dist. No. 68 v. Green Valley Builders, Inc.,* 40 Ill.App.3d 812, 352 N.E.2d 306 (1976), nor *Weather-Gard Indus., Inc. v. Fairfield Sav. & Loan Ass'n,* 110 Ill. App.2d 13, 248 N.E.2d 794 (1969) hold or suggest that this Court should endeavor to ascertain the intentions of the contracting parties during the course of performance.

9. Due to our disposition of the instant appeal, we need not review the district court's conditional granting of Ledoux's alternative motion for a new trial.