744 F.2d 1015
 40 Fed.R.Serv.2d 223
 Jule FINKLE and Jack H. Felzer, Trustees under Deed of Trust
dated April 10, 1962; Jack Finkle and Jack H. Felzer,
Trustees under Deed of Trust dated April 11, 1962; Jack
Finkle and Jack H. Felzer, Trustees under Deed of Trust
dated April 12, 1962; Jule Finkle and Jack H. Felzer,
Trustees under Deed of Trust Dated April 13, 1962, as joint
venturers under Joint Venture Agreement dated April 14,
1962, Appellants in No. 83-1465,
v.
GULF & WESTERN MANUFACTURING COMPANY and Gulf & Western
Industries, Inc., Appellees in No. 83-1465,
v.
PHILMONT STEEL PRODUCTS, INC., Appellee in No. 83-1465,
Cross-Appellant in No. 83-1476,
v.
Jule FINKLE and Jack H. Felzer, Trustees under Deed of Trust
dated April 10, 1962; Jack Finkle and Jack H. Felzer,
Trustees under Deed of Trust dated April 11, 1962; Jack
Finkle and Jack H. Felzer, Trustees under Deed of Trust
dated April 12, 1962; Jule Finkle and Jack H. Felzer,
Trustees under Deed of Trust Dated April 13, 1962, as joint
venturers under Joint Venture Agreement dated April 14,
1962, Cross-Appellees in No. 83-1476.
 Nos. 83-1465, 83-1476.
 United States Court of Appeals,
Third Circuit.
 Argued April 3, 1984.
Decided October 5, 1984.
 
 Jeffrey Cooper (argued), Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for appellants-cross appellees.
 Roslyn G. Pollack (argued), Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for appellee-cross appellant Philmont Steel Products, Inc.
 John E. McKeever, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellee Gulf & Western Industries, Inc.
 Before GIBBONS, SLOVITER, Circuit Judges, and BISSELL, District Judge.*
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 Jule Finkle, Jack Finkle and Jack H. Felzer (hereinafter referred to as "Finkle") joint venturers, trustees under deeds of trust and lessors of a commercial property, appeal from the judgment entered on a directed verdict denying their claim for a payment that the district court held was an unenforceable penalty. Philmont Steel Products, Inc. (Philmont), assignee of the lease at issue, cross-appeals from the judgment denying its claim for damages it sustained by being forced to vacate the property, which judgment was also entered on a directed verdict. We affirm.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 2
 Through a series of assignments not relevant here, plaintiffs, citizens of Pennsylvania acting as trustees and joint venturers under Pennsylvania deeds of trust and a joint venture agreement, leased a manufacturing facility in Huntingdon Valley, Pennsylvania to Gulf & Western Manufacturing Company (G&WM), a Delaware corporation. G&WM's performance under the lease was guaranteed by its parent, Gulf & Western Industries, Inc. (G&WI), also a Delaware corporation. G&WM assigned its rights under the lease to Philmont, a Pennsylvania corporation, which located operations at the facility in October, 1980.
 
 
 3
 As modified most recently in 1977, the lease was to expire October 31, 1982 unless a renewal option was exercised 180 days prior to expiration, i.e., by May 4, 1982. No action was taken until May 5, when Philmont claims to have notified Finkle orally of an intention to renew. A letter stating this intention was mailed May 6 and was received May 11. On May 12, Finkle notified Philmont that it refused to recognize the renewal as timely. After the lease then "expired," Philmont moved its operations at an expense it claims exceeded $100,000.
 
 
 4
 The lease contained a provision added in 1977 stating that if the lessee did not exercise its first option to renew, it would pay the lessor the sum of $76,941. Finkle filed suit in the United States District Court for the Eastern District of Pennsylvania against G&WM and G&WI to compel payment of this sum. Federal jurisdiction was asserted based on diversity of citizenship as neither Delaware corporation had its principal place of business in Pennsylvania, the state of plaintiffs' citizenship.
 
 
 5
 The Gulf & Western defendants asserted as a defense that Philmont's attempted exercise of the renewal option was timely. Defendants also filed a third-party complaint under Fed.R.Civ.P. 14(a) against their assignee Philmont, claiming that Philmont had agreed to indemnify them for any damages proved by Finkle and for the cost of defending suit. In its answer Philmont denied any obligation to indemnify and asserted as defenses that it had complied with the renewal terms and that the sum sought by Finkle was an unenforceable penalty. As permitted by the express language of Fed.R.Civ.P. 14(a),[1] Philmont also asserted a claim against plaintiff Finkle for the costs it had incurred in relocating. Finkle, in turn, asserted a counterclaim against Philmont under Fed.R.Civ.P. 13(a) for payment of the $76,941.
 
 
 6
 As of trial, Philmont apparently had agreed to indemnify the Gulf & Western defendants, who did not actively participate. Jule Finkle, the only witness called, testified that the $76,941 represented or approximated the amount then owing on a loan of $83,000 Finkle had made to G&WM to pay for improvements to the leased property. At the conclusion of Finkle's presentation, the district court granted Philmont's motion for a directed verdict, concluding that under Pennsylvania law the clause requiring the $76,941 payment was unenforceable as a penalty and that no actual damages had been shown. The court also granted Finkle's motion for directed verdict, concluding that under Pennsylvania law time is of the essence and that any late renewal was insufficient to trigger an obligation by lessor to accept it.
 
 II. JURISDICTION
 
 7
 Although the claims presented in this case were authorized by the Federal Rules of Civil Procedure, we must still decide whether there is federal subject matter jurisdiction over them. Of course, Finkle's claim against the Gulf & Western defendants, which are not Pennsylvania corporations and have principal places of business in New York and Michigan, was within the diversity jurisdiction provided by 28 U.S.C. Sec. 1332(a)(1). Therefore, the district court would have had ancillary jurisdiction, even if there had been no diversity, over the Gulf & Western defendants' third-party claim against Pennsylvania corporation Philmont for indemnification. See Field v. Volkswagenwerk AG, 626 F.2d 293, 298-99 (3d Cir.1980); Sheppard v. Atlantic States Gas Co., 167 F.2d 841, 844-45 (3d Cir.1948). That claim had a sufficiently close nexus to the plaintiffs' federal claim to be one "case" for purposes of Article III, section 2 of the Constitution.
 
 
 8
 Persuasive authority also holds that a third-party defendant such as Philmont, which is subject to a plaintiff's claims by way of the third-party impleader, may bring claims authorized by Fed.R.Civ.P. 14(a) against the original plaintiff notwithstanding the lack of an independent basis of jurisdiction for such claims. See Mayer Paving & Asphalt Co. v. General Dynamics Corp., 486 F.2d 763, 772 (7th Cir.1973), cert. denied, 414 U.S. 1146, 94 S.Ct. 899, 39 L.Ed.2d 102 (1974); Revere Copper & Brass, Inc. v. Aetna Casualty & Surety Co., 426 F.2d 709, 711-17 (5th Cir.1970); L & E Co. v. United States ex rel. Kaiser Gypsum Co., 351 F.2d 880, 882 (9th Cir.1965); C. Wright, Federal Courts Sec. 76, at 517 (4th ed. 1983); 3 Moore's Federal Practice p 14.27, at 14-118 (1984); The Supreme Court, 1977 Term, 92 Harv.L.Rev. 5, 247 (1978). Such claims are unlikely to be collusively manufactured so as to circumvent the rule of complete diversity.
 
 
 9
 [O]nly by the most remote coincidence could a third party find a friendly defendant to implead him, ostensibly on a claim of recovery over, but in reality for the purpose of allowing the third party to assert a claim against the plaintiff.
 
 
 10
 3 Moore's Federal Practice at 14-118. It is both efficient and fair to allow Philmont to answer Finkle's suit in one action in federal court with its own claims that arise from the same transaction or occurrence.
 
 
 11
 We also hold that if, as here, a third-party defendant asserts claims under Rule 14(a) against plaintiff, ancillary jurisdiction extends to support plaintiff's "compulsory counterclaim" under Fed. R. Civ. P. 13(a). Such claims are induced by the third-party's choice to assert its claims against plaintiff. Generally, no independent basis of federal jurisdiction is required for compulsory counterclaims. See 3 Moore's Federal Practice p 13.15, at 13-280-81; Moore v. New York Cotton Exchange, 270 U.S. 593, 609-10, 46 S.Ct. 367, 370-71, 70 L.Ed. 750 (1926) (sustaining ancillary jurisdiction over a counterclaim that arose out of same transaction as the plaintiff's federal claim). This principle applies here as well. As the Seventh Circuit recently reasoned in Evra Corp. v. Swiss Bank Corp., 673 F.2d 951, 960 (7th Cir.), cert. denied, 459 U.S. 1017, 103 S.Ct. 377, 74 L.Ed.2d 511 (1982), the third-party defendant "may not invoke the jurisdiction of the federal courts in order to bring a state-law claim against a nondiverse party and then use the lack of diversity to force that party to bring its identical claim ... in a state court." See also 3 Moore's Federal Practice p 14.27, at 14-119; L & E Co. v. United States, 351 F.2d at 882.
 
 
 12
 This result is consistent with Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). The Court there held that 28 U.S.C. Sec. 1332 impliedly negated the exercise of ancillary jurisdiction over plaintiff's claim under Rule 14(a) against a non-diverse, impleaded third-party that had not asserted any claims against plaintiff. Kroger, a citizen of Iowa, had brought a wrongful death action for negligence against a Nebraska defendant that impleaded what was later revealed to be an Iowa corporation for contribution as a joint tortfeasor. Kroger then amended her complaint to claim negligence against the impleaded Iowa corporation.
 
 
 13
 In holding that Kroger's Rule 14(a) claim was not within the statutory grant of section 1332, the Court distinguished claims such as impleader, cross-claims, counterclaims, and intervention as of right, over which the lower federal courts had often exercised ancillary jurisdiction, 437 U.S. at 375-77 & n. 18, 98 S.Ct. at 2403-04 & n. 18. The Court stated that "the context in which the nonfederal claim is asserted is crucial." Id. at 376, 98 S.Ct. at 2404. First, plaintiff's claim against the nondiverse third-party corporation was "entirely separate from her original claim [against the Nebraska corporation] ... since the [non-diverse third party's] liability to her depended not at all upon whether or not [the Nebraska corporation] was also liable. Far from being an ancillary and dependent claim, it was a new and independent one." Id. Second, plaintiff had "voluntarily" asserted the "nonfederal" claim against the Iowa corporation by her amended complaint. The claim was not "by a defending party haled into court against his will, or by another person whose rights might have been irretrievably lost unless he could assert them in federal court." Id.
 
 
 14
 These same considerations of choice and logical dependence counsel a different conclusion as to a plaintiff's compulsory counterclaim against a third-party defendant under Fed.R.Civ.P. 13(a). As illustrated by the facts of this case, such claims are neither so voluntary or independent of the principal claim as to raise the concern that they undermine the meaningful requirements of diversity of citizenship. Finkle appeared satisfied to recover only against the Gulf & Western defendants. Their claim on impleader against Philmont for indemnification was logically dependent on Finkle's primary claim. Philmont, haled into court against its will and likely to be subject to any judgment in favor of Finkle, is entitled to the opportunity in one action to reach back and assert a claim against Finkle that arises out of the same lease transaction. Because the district court had ancillary jurisdiction over Philmont's claim against Finkle, it also had jurisdiction over Finkle's compulsory counterclaim against Philmont.
 
 III. EXERCISE OF RENEWAL OPTION
 
 15
 If Philmont timely exercised the renewal option, we would not have to reach the issue of Finkle's right to payment due on non-exercise. Therefore, we turn first to Philmont's claim. Philmont argues, both as a defense to Finkle's claim and as the basis of its own claim for damages upon wrongful termination, that it timely exercised its renewal option even though no notice was sent by the date specified in the contract. The 1977 lease modification states, "provided that lessee gives notice no later than 180 days prior to the expiration of the current term of this lease, lessee shall have three consecutive options to extend the lease." App. at 173a (emphasis added). This language is unequivocal and establishes an enforceable renewal deadline.
 
 
 16
 Philmont has not contended that the date was waived or that Finkle prevented or impeded exercise of the option. Nor did Philmont make any offer of proof to the district court that the delay was caused by accident, fraud, surprise, mistake, or any other cause apart from Philmont's own negligence or inadvertence. Instead, Philmont claims that its late acceptance should have been honored as "reasonable." Recent Pennsylvania Superior Court decisions hold that when there is no excuse other than mere negligence, equity will not aid the tardy optionee. See Western Savings Fund Society v. Southeastern Pennsylvania Transportation Authority, 285 Pa. Super. 187, 196, 427 A.2d 175, 180-81 (1981) (in banc); Lotz v. City of McKeesport, 70 Pa. Commw. 401, 403, 453 A.2d 74, 76 (1982). This principle applies even in the absence of detriment to the optionor. Western Savings Fund Society, 285 Pa. Super at 197, 427 A.2d at 180.
 
 
 17
 The Pennsylvania Supreme Court has repeatedly held that "[t]ime is always of the essence in an option contract." New Eastwick Corp. v. Philadelphia Builders, 430 Pa. 46, 50, 241 A.2d 766, 769 (1968). See Phillips v. Tetzner, 357 Pa. 43, 45, 53 A.2d 129, 131 (1947) (citing cases). That court may have left open the possibility that in certain circumstances equity may override an explicit renewal term. See Warner v. Bedell Co., 278 Pa. 576, 578-79, 123 A. 490, 491 (1924) (per curiam). However, we believe that it, like the Pennsylvania Superior Court, would not excuse mere negligence in failing to renew. See Warner v. Bedell Co., 278 Pa. at 578-79, 123 A. at 491 (renewal could have been mailed one day earlier so as to have arrived in time); Woodrum v. Pulliam, 453 S.W.2d 263, 265 (Ky.Ct.App.1970); Koch v. H. & S. Development Co., 249 Miss. 590, 163 So.2d 710, 724 (1964); McClellan v. Ashley, 200 Va. 38, 104 S.E.2d 55, 58-59 (1958) (all holding inadvertence or negligence an insufficient basis to permit exercise of renewal option after contractual deadline). Although there may be valid reasons for a state to decide otherwise, see J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc., 42 N.Y.2d 392, 397-400, 366 N.E.2d 1313, 1316-17, 397 N.Y.S.2d 958, 960-62 (1977) (excusing late acceptance of lease renewal, where result would be forfeiture of improvements, if no prejudice would be result to lessor), we believe on the basis of the Pennsylvania precedent that the Pennsylvania Supreme Court would reject Philmont's argument that it should be relieved of the consequences of its own inadvertence. We therefore affirm the district court's decision to direct a verdict against Philmont's claim.[2]
 
 IV. ENFORCEABILITY OF PAYMENT CLAUSE
 
 18
 The original lease entered into in 1962 with the G&W companies was for 20 years at an annual rental of $34,500, payable in monthly sums of $2,875. It provided that at expiration, the premises including any improvements were to revert to the lessor. In 1977, G&W indicated its interest in building an addition. The parties entered into a lease modification that provided that "Lessor has constructed for Lessee a 15,000 square foot addition to the Premises," and stated, "On or before November 1, 1977, Lessor shall reimburse Lessee the sum of $83,000, which sum Lessee has heretofore expended in connection with the construction of the addition." (emphasis added). The annual rent was increased to $44,140.44, and the lease was to expire on October 31, 1982.
 
 
 19
 The lessee was given three successive renewal options provided it gave notice at least 180 days prior to expiration of the lease. The modification contained a provision that if lessee did not exercise these options, lessee would be required to pay $76,941 upon non-exercise of the first renewal option; $62,084 upon non-exercise of the second option; and $38,263 upon non-exercise of the third option. In 1980, the lease was assigned to Philmont.
 
 
 20
 Finkle's claim for $76,941 is based on the provision in Paragraph 5 which states:
 
 
 21
 In the event Lessee does not exercise its option for the first option term as hereinabove provided Lessee agrees to pay the Lessor prior to termination of the Lease, the sum of $76,491.00.
 
 
 22
 The district court directed a verdict for Philmont and against Finkle on the ground that this provision constitutes a penalty that is not enforceable under Pennsylvania law. Since we are reviewing the grant of a directed verdict, our review is plenary and we apply the same standard as would the district court in passing on the motion originally. See Maggipinto v. Reichman, 607 F.2d 621, 624 n. 7 (3d Cir.1979); 9 C.Wright & A. Miller, Federal Practice & Procedure Secs. 2524, 2536 (1971).
 
 
 23
 Pennsylvania follows the principles set forth in the original Restatement of Contracts (1932) with regard to the non-enforcement of contractual provisions that establish penalties. See Restatement of Contracts Sec. 339. When the parties have made a reasonable forecast as to just compensation for an injury that was difficult to estimate at the time they entered into the contract, that provision will be deemed to be one for liquidated damages, and enforceable. On the other hand, a provision that calls for payment of a sum on non-performance or on default that is disproportionate to the value of the performance promised or the injury that has actually occurred will be deemed a penalty. See Corbin on Contracts Secs. 1063-1066 (1964). As the Pennsylvania Superior Court has stated, "If the amount of damages assessed is subsequently adjudged unreasonable in the light of either anticipated or actual harm, the contractual provision will be voided as a penalty: Restatement, Contracts, Sec. 339, 12A PS Sec. 2-718," Unit Vending Corp. v. Tobin Enterprises, 194 Pa. Super. 470, 473, 168 A.2d 750, 751 (1961).
 
 
 24
 The provision calling for payment of $76,941 cannot be justified on the basis that it was difficult to estimate the amount of actual damages on default. Indeed, there was no default by the lessee, since it was not obliged to renew the lease. Thus, Finkle does not argue that the sum represents liquidated damages in the traditional sense of a prior estimate of future damages upon breach.
 
 
 25
 Nor does Finkle contend that when it leased the property to another lessee after it refused to renew Philmont's lease, it received less rent than it would have received had Philmont timely exercised the renewal option. Jule Finkle testified that the property was never empty, App. at 81a, and Finkle's counsel conceded that it subsequently sold the property. App. at 83a. Finkle has not claimed that it received less from that sale because of Philmont's actions. Therefore, Finkle has produced no evidence of actual damages in the sense generally recognized by the courts, i.e. damages suffered because Philmont did not exercise the option to renew the lease.
 
 
 26
 Because Finkle has shown no such damage and has repossessed the premises, Finkle's recovery of the sum demanded would violate the Pennsylvania rule that even upon breach of a material condition in a commercial lease a landlord must elect between repossession and actual damages or acceleration of the balance due. See, e.g., H.A. Steen Industries, Inc. v. Richer Communications, Inc., 226 Pa. Super. 219, 224-25, 314 A.2d 319, 321-22 (1973) (lessor of billboard space may not repossess and re-let space and collect rent due); Pierce v. Hoffstot, 211 Pa. Super. 380, 236 A.2d 828 (1967) (acceleration clause valid, but tenant must be afforded possessory rights); Unit Vending Corp. v. Tobin Enterprises, 194 Pa. Super. at 478, 168 A.2d at 753-54 (lessor of vending machine may not repossess and seek lost profits without mitigating damages by re-rental).[3]
 
 
 27
 Finkle argues, however, that it suffered "actual damages" of $76,941, the sum set forth in the contractual provision, because the lease modification was in fact a loan agreement ancillary to the main provisions of the underlying lease under which Finkle lent $83,000 to finance improvements for the tenant. It is Finkle's position that since it was not obliged to build the $83,000 addition to the premises, its contractual undertaking to pay that sum represented a loan that was to be recouped over the life of the lease (including the three renewals) in increased rent. The $803 per-month increase purportedly represented recovery of the $83,000 principal and nine and one-half percent interest. Jule Finkle testified that each of the sums payable upon non-renewal represented the parties' prior determination of the loan balance that would be due as of these dates.[4]
 
 
 28
 There are several difficulties with Finkle's contention. In the first place, this suit was not brought for repayment of a loan. There is no instrument reflecting such a loan. Nothing in the lease modification refers to the $83,000 payment by Finkle to Gulf and Western as a loan. In fact, the contract language leads to a different construction of the arrangement since it refers to lessor's undertaking to "reimburse" lessee for the sum lessee expended to construct the addition.
 
 
 29
 In the second place, it is apparent that such an arrangement would be considered unenforceable in Pennsylvania, even if structured as a "loan." In Unit Vending, supra, the court considered two contracts for the lease of cigarette vending machines. In the first, the lessee accepted a "loan" of $500, which he agreed to repay by installments over six years at $5.00 per week plus commissions on sales. The contract provided that upon termination or breach the lessor could repossess the machine, demand repayment of the balance of the "loan", and demand payment of the average monthly profits the lessor would have received had the arrangement continued. The court held that this measure of damages was a penalty, calling the agreement, "a clever attempt to secure both the penny and the cake for the appellant-plaintiff." 194 Pa. Super. at 476, 168 A.2d at 753. The second contract recited that $200 had been paid to lessee, and provided that upon breach the lessor could elect between repayment of the $200 and repossession or the average monthly profit for the remainder of the lease and repossession. The court held that a confession of judgment awarding future profit and repossession could not be sustained because this award did not provide for consideration of lessor's mitigation of damages by relocating the vending machine. The court reasoned that:
 
 
 30
 Where the lessor of real estate terminates the lease and enters into possession he cannot have possession of the premises and also judgment for rent for the unexpired period of the lease.
 
 
 31
 The operator [lessor] should not be compensated for any profits that it might have been able to obtain by placing the machine in another location. It had the duty to minimize its damages by so doing if this were possible.
 
 
 32
 We agree with the court below "that justice and equity require the opening of the judgment so that evidence may be offered to ascertain the actual damages suffered by plaintiff."
 
 
 33
 194 Pa. Super. at 478, 168 A.2d at 753-54 (citations omitted).
 
 
 34
 As we noted above, there was no evidence of actual damages suffered by Finkle. Thus, even if Finkle had undertaken to invest $83,000 to construct the addition which it had no legal obligation to construct and sought to recapture that investment from the tenant by an increase in the lease payments, Pennsylvania would not permit the lessor to achieve a double recapture. Its extraction of this sum from Philmont while it retained the enhanced property which generated an equivalently increased rent from the subsequent tenant would effect just such a double recapture or as the Pennsylvania Superior Court has more graphically stated, would secure Finkle "both the penny and the cake." In the absence of evidence of actual harm, Pennsylvania would view the landlord's exaction of $76,941 from the lessee merely because the lessee was a week late in exercising its renewal option to be grossly disproportionate to any possible harm suffered and hence a penalty.
 
 
 35
 It is no answer that notwithstanding Finkle's repossession, the lessee would have had to repay a third party lender had lessee contracted to finance the improvements in that manner. The fact remains that it did not do so. It might not have undertaken to construct the addition under that situation. In any event, the third party lender would have borne the risk of non-payment, a risk never assumed by Finkle on the facts before us. It is the windfall to Finkle that Pennsylvania abjures. It follows that although the parties may have knowingly entered into the lease modification providing for the payment on non-exercise of the renewal option, the district court correctly held that Pennsylvania would consider that sum an unenforceable penalty.
 
 V. CONCLUSION
 
 36
 For the reasons stated above, the judgment of the district court will be affirmed.
 
 
 37
 GIBBONS, Circuit Judge, dissenting.
 
 
 38
 I join in Parts II and III of the opinion of the court, holding that there is subject matter jurisdiction over a claim by the third party defendant against the initial plaintiff, and that the option was not exercised in a timely manner. I dissent, however, from Part IV, dealing with enforceability of the payment for improvements clause, and thus from the judgment affirming in full.
 
 
 39
 My analysis of the payment for improvements clause begins with an examination under Pennsylvania law of the enforceability of conditions for the payment of contract damages. In Pennsylvania, a clause providing for the payment of a "penalty" upon the fulfillment of a contract condition is unenforceable. In contrast, a clause providing for the payment of "liquidated damages" upon the fulfillment of such a condition is enforceable. See Keck v. Bieber, 148 Pa. 645, 24 A. 170, 170-71 (1892). The Pennsylvania Supreme Court has described the inquiry for distinguishing between a "penalty" and "liquidated damages" as follows:
 
 
 40
 The question whether an amount stated in a contract to be paid by one party or the other, in event of the breach of a covenant or condition in an agreement, shall be construed a penalty or liquidated damages, must be determined by the intention of the parties as indicated in the phraseology of the entire contract, construed in the light of its subject-matter and its surrounding; and in determining this question the court will consider, among other matters, the relation which the amount stipulated bears to the injury likely to result from the breach complained of, the complications incident to the questions involved, and such other matters as are legally or indispensably essential in determining the question.... It is not important whether the parties have named the sum a penalty or liquidated damages.
 
 
 41
 Lackawanna Boiler & Grate Co. v. Lee Coal Storage Co., 290 Pa. 561, 564-65, 139 A. 315, 316 (1927) (citation omitted).
 
 
 42
 The facts of Lackawanna Boiler illustrate a clause characterized as "penal." Lee Coal had agreed to haul coal at a rate of 50 cents per ton. Lackawanna, in turn, had agreed to compensate Lee at the rate of $1.50 per hour for time during which Lee's trucks were forced by Lackawanna to stand idle. The Pennsylvania Supreme Court reasoned that the provision of $1.50 per hour bore no relationship to actual injury for delay; rather, the court concluded, the figure was "merely in the nature of a penalty to reimburse plaintiff for such time as its trucks were forced to stand idle without fault on its part...." Id.[1]
 
 
 43
 A common illustration of a liquidated damages clause, in contrast, is a provision providing for the forfeiture of a downpayment in the event that a condition precedent to the sale of real estate does not occur. Laughlin v. Baltalden, Inc., 191 Pa. Super. 611, 159 A.2d 26 (1960), is an example. Laughlin, the seller of a home, required a downpayment of $1900 on the sale of property worth $21,800, and provided that if the purchasers failed to make a settlement--a condition precedent--the seller would keep the $1900 as liquidated damages. The court reasoned that the value of the damages represented only nine percent of the total consideration, and was roughly related to the seller's expenses for interest, taxes, utilities, and so forth, before the property was actually sold. The clause was therefore enforceable.
 
 
 44
 We must decide whether Finkle's provision for the payment of $76,941 is a "penalty" attending the non-fulfillment of a condition precedent--here the non-renewal of the lease after five years--within the meaning of these Pennsylvania cases. I agree with the majority that our review is plenary. I begin that review with two observations.
 
 
 45
 First, the essence of Finkle's contract was an agreement for the lessee to make improvements to the lessor's property. An initial question therefore is whether such a contract is enforceable even when the lessee vacates the premises shortly after making improvements. As I note below, it is.
 
 
 46
 Second, we must examine the significance of the terms of financing in order to see if they operated as a "penalty." Finkle acted as the financier of his own improvements. As such, he was the equivalent of an outside financier whose loan agreement contained an acceleration clause. That clause authorized the functional lender to accelerate the loan upon the occurrence of a condition--here, that Gulf did not renew the lease. The finance agreement is therefore wholly equivalent to an agreement of an outside lender who finances a lessee's improvements to a lessor's property, and who incorporates an acceleration clause providing that the loan will accelerate if the lessee vacates the lessor's property. Of course, acceleration clauses are nothing special. We must decide whether the acceleration of the loan on this particular condition--the non-renewal of the lease--operates as a "penalty."
 
 
 47
 1. Lessee's improvements to lessor's property
 
 
 48
 Under Pennsylvania law, an agreement by the lessee to improve the lessor's property is enforceable even when the lessee vacates the premises shortly after making improvements. A recent leading case on the subject, much discussed in the briefs, is Western Savings Fund Society v. Southeastern Pennsylvania Transp. Authority, 285 Pa. Super. 187, 427 A.2d 175 (1981). Western and Southeastern Pennsylvania Transportation Authority (SEPTA) entered into a lease providing that Western would make about $84,000 in improvements to SEPTA's property. The lease was for a ten-year term, and provided for an option to renew for an additional ten years. After Western inadvertently failed to renew the lease in a timely fashion, SEPTA terminated the agreement. The court rejected an argument that Western's loss of $84,000 constituted a forfeiture:
 
 
 49
 The chancellor found that the lease obligated Western to make various improvements in the premises. To that end, Western apparently spent some $84,000. We note, however, that the lease agreement not only obliged Western to make the improvements but also stipulated that such improvements would become the property of the lessor (SEPTA) at the termination of the lease. Thus, it would have been unreasonable for Western to have had an expectation of continued retention of such improvements for any period longer than strict compliance with the lease would permit. Having agreed to the lease[,] its only reasonable expectation was that it would have the use of such improvements for ten years and, assuming the option was timely exercised, for an additional ten year period.... Notwithstanding its own error, therefore [in failing to renew on time], Western would, nonetheless, have received precisely what it had bargained for under the 1966 lease--twenty years' use of the improvements required by the lease. We thus find the chancellor's concern for preventing a forfeiture grossly overstated.
 
 
 50
 285 Pa. Super. at 191 n. 3, 427 A.2d at 177 n. 3 (emphasis in original); see also id. at 196-97, 427 A.2d at 180 (reiterating that loss of improvements was not a forfeiture).
 
 
 51
 Gulf, like Western, contracted to improve property of the lessor. Moreover, Gulf did so with full knowledge that it might vacate before the expiration of the eighteen-year term of the lease, and indeed expressly reserved three options to vacate early. Like Western, Gulf's expectation was simply "that it would have the use of such improvements" until the company vacated the premises. That is an enforceable agreement under Pennsylvania law--as it should be. There is nothing extraordinary in Gulf's decision to enter into such an agreement. The company, for example, may have found it less expensive to improve Finkle's property at its own expense than to relocate its entire manufacturing operation elsewhere. Whether that supposition should prove to be true or not, however, should have no bearing on our judgment. We have no role under Pennsylvania law in second-guessing Gulf's decision to improve Finkle's property at its own expense.
 
 
 52
 Philmont Steel Products, Inc. appears to concede as much. The company argues that the $76,941 payment provision would have been enforceable if "the tenant [had been] required to build the improvements in order to obtain the privilege of leasing the space in the first instance." Br. at 13 (emphasis added) (citing Western Savings). The vice, Philmont suggests, simply lies in "[t]ying the payment to the right to leave." Id. I turn, therefore, to the question whether tying the acceleration clause to the "right to leave" indeed, as Philmont contends, operated as a "penalty."
 
 2. The acceleration clause
 
 53
 As I noted earlier, Finkle financed the improvements made by Gulf to his premises, and the finance agreement provided for an acceleration of the loan in the event that Gulf failed to renew the lease. Philmont maintains that the acceleration of the loan as a condition of renewal operated as a "penalty."
 
 
 54
 In so arguing, Philmont misconceives the nature of an acceleration clause. The present value of a loan is unchanged by an acceleration of the balance due, provided that the accelerated balance is equal to the unpaid portion of the principal. In Philmont's case, the balance due ($76,941) was roughly equal to the unpaid portion of the principal ($71,820.44).[2] Although there is a slight discrepancy between the accelerated value and the unpaid principal, this differential could easily be explained by legitimate costs to the lessor caused by Gulf's early departure. Under Pennsylvania law, such payment provisions rationally related to one party's expenses are not unenforceable as a penalty. See, e.g., Laughlin, supra, 191 Pa. Super. at 618, 159 A.2d at 29. Nor does Philmont seriously argue that the small differential between the balance due and unpaid principal alone renders the acceleration clause a penalty. Rather, it is Philmont's position that the acceleration clause itself is, as a matter of law, a penalty.
 
 
 55
 I simply cannot agree with this position. The clearest refutation of the argument is the observation that Philmont could always have re-entered the credit market and obtained a second loan for the same terms as the prior loan, using the proceeds to satisfy the acceleration clause in Finkle's lease. Nothing in the record suggests that Philmont could not obtain such a loan for a similar term and rate of interest. Indeed, Philmont's true objection is not that the present value of the cost of the loan increased because of the acceleration, or that it is unable to make a sudden balloon payment to Finkle. To the contrary, Philmont's gripe is simply that it must make an accelerated payment having vacated the premises. However, Western Savings establishes that Philmont was obligated to pay for the improvements without regard to whether it vacated the premises. And the acceleration clause did not change the present value of the cost of those improvements. In short, Philmont's objection is not to the repayment schedule at all, but simply to its obligation to pay for the improvements after having vacated the premises. That is, Philmont's objection is to Western Savings itself.
 
 
 56
 Moreover, serious adverse consequences may follow from a holding that a lender may not tie an acceleration clause to a lessee's failure to renew a lease. There are perfectly rational economic reasons for accelerating a loan balance when a lessee vacates a lender's property. In this instance, for example, Finkle had an effective security interest by virtue of the presence of Philmont's equipment on his property. When Philmont vacated the property, Finkle lost a convenient means of security. Under that circumstance, it is entirely rational for Finkle to seek an acceleration of the loan.
 
 
 57
 Finally, under Pennsylvania law, acceleration clauses in commercial mortgages predicated on reasonable conditions are generally honored. See Bell Federal Savings & Loan Ass'n v. Laura Lanes, Inc., 291 Pa. Super. 395, 400, 435 A.2d 1285, 1287 (1981); Ministers & Missionaries Benefit Board v. Goldsworthy, 253 Pa. Super. 321, 328-29, 385 A.2d 358, 362 (1978). As a rule, those conditions relate to the mortgagor's default. However, there is no indication that the Pennsylvania courts would disapprove of an acceleration provision predicated on other rational grounds, and the clause in Finkle's lease is manifestly predicated on such a ground. I note as well that Finkle, Gulf, and Philmont are all knowledgeable commercial actors. There is no evidence that the bargain between Gulf and Finkle was the product of overreaching, or that the assignment between Gulf and Philmont was not an arms-length commercial transaction.
 
 
 58
 For these reasons, I would hold that there is no basis for sustaining a directed verdict for Gulf and Philmont at the close of Finkle's case. It cannot be held that as a matter of law acceleration of the payments Philmont undertook to make was a penalty. I would reverse and remand for trial on Finkle's claim, recognizing that when Philmont's case is presented, the argument that the claim involves a penalty might appear differently.
 
 
 
 *
 Hon. John W. Bissell, United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 Rule 14(a) states in part:
 The third-party defendant may assert against the plaintiff any defenses which the third-party plaintiff has to the plaintiff's claim. The third-party defendant may also assert any claim against the plaintiff arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff. The plaintiff may assert any claim against the third-party defendant arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff, and the third-party defendant thereupon shall assert his defenses as provided in Rule 12 and his counterclaims and cross-claims as provided in Rule 13.
 (emphasis added).
 
 
 [2]
 Our opinion in American Houses, Inc. v. Schneider, 211 F.2d 881 (3d Cir.1954), which was based on federal common law, is not to the contrary. Although dictum suggested that Pennsylvania courts would recognize equitable interests that override a provision for timely renewal, we did not suggest that negligence would warrant such an override. Instead, we found that there was no fault that could have been attributed to the lessee in that case. Id. at 884
 
 
 [3]
 Even were the dissent persuasive in characterizing the lease modification as an agreement by Gulf to improve the property at its own expense and in denominating the penalty clause as an acceleration clause, we know of no Pennsylvania case permitting acceleration of payments due without applying proceeds to the amount due. Furthermore, as noted in the text, the language of the lease modification reflects only the lessor's undertaking to "reimburse" Gulf and Western for the improvement, rather than the contrary construction the dissent finds. Similiarly there is no language in the modification that can be construed as an acceleration clause and no provision characterizing the transaction as a loan subject to acceleration
 
 
 [4]
 Philmont points out that the sums set forth on non-renewal of the lease do not equal the amounts payable on an $83,000 loan at 9 1/2 interest. Finkle did not dispute that there are variances, but argued that the amounts may have been miscalculated when the agreement was signed. Because our decision does not rest on this discrepancy, we need not resolve these contentions
 
 
 [1]
 The court's characterization of the $1.50 per hour clause as a penalty "in the event of a breach of a covenant or condition in an agreement" is technically a misnomer. The clause is simply a contract condition, upon the occurrence of which a sum certain becomes due. No breach occurs until the sum certain is not paid
 The equities in Lackawanna Boiler favored finding a penalty. Lackawanna, the defendant, had argued that Lee could recover no damages because the payment of $1.50 was intended as liquidated damages. Lee, in turn, argued that the clause was a penalty and not liquidated damages.
 
 
 [2]
 The parties concede, curiously, that the $76,941 does not equal the unpaid balance. An amortization table in the record reveals that the appropriate balance is only $71,820.44. Neither party has offered an explanation for the discrepancy. App. at 88-89